UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENNETH S., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br>Commissioner of Social Security, <br><br> Defendant. | Case No. 18 C 5047 <br><br> Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth S. seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits and Supplemental Security Income. For the reasons that follow, the Court grants in part Kenneth's request for a remand, denies the Commissioner's motion [28], reverses the ALJ's decision in part, and remands this case for further proceedings consistent with this Opinion.

## BACKGROUND

Born on April 25, 1966, Kenneth was 47 years old at the time he alleges he became disabled. Kenneth has a history of spinal stenosis, carpal tunnel syndrome, hyperlipidemia, lumbar herniated disc, cervicalgia, and arthralgia of the right hip. He underwent a lumbar microdiscectomy in 2009 and a fusion in his neck in 2010 and continues to suffer back, neck, shoulder, and hip pain. Kenneth maintains that he is illiterate, even though he was able to complete high school. With the assistance of a benevolent employer, Kenneth worked for the same syrup factory as a production laborer (unskilled, heavy) from 1982 to 2013. (R. 318-19).

**DISCUSSION**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4).[1] "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing an ALJ's decision, the Court may

---

[1] The regulations governing DIB and SSI are virtually identical. *Mayra M. v. Saul*, 2019 WL 6716612, at *1 n.2 (N.D. Ill. Dec. 10, 2019). Accordingly, for convenience, the Court cites only to the DIB regulations.

2

"not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

At step one, the ALJ found that Kenneth had not engaged in substantial gainful activity since his alleged onset date of November 1, 2013. (R. 70). At step two, the ALJ determined that Kenneth has the severe impairments of spinal disorder, right hip disorder, right shoulder disorder, and history of neck fusion. *Id*. The ALJ found that there was no evidence of any medically determinable impairment as described in Listings 12.02, 120.5, and 12.11. *Id*. at 71. At step three, the ALJ found that Kenneth did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, including Listings 1.02, 1.03, 1.04, and 1.08. *Id*. The ALJ then concluded that Kenneth retains the residual functional capacity ("RFC") to perform light work except that he should: never climb ladders, ropes, or scaffolding; no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend, or twist; reach overhead no more than frequently bilaterally; and use his hands no more than frequently bilaterally to handle, finger, and feel. *Id*. at 72. At step four, the ALJ found that Kenneth was unable to perform his past work as a production laborer. *Id*. at 75-76. She also found that Kenneth was a younger individual with "at least a high school education" and that he is able to

communicate in English. *Id*. at 76. At step five, the ALJ found that jobs exist in significant numbers in the national economy that Kenneth can perform, such as laundry sorter, deli slicer, and parking meter coin collector. *Id*. at 76-77. If he could not read or write, the ALJ found that Kenneth could perform the laundry sorter job and the sedentary, unskilled jobs of stuffer and final assembler. *Id*. at 77. Thus, the ALJ determined that Kenneth was not disabled under the Social Security Act. *Id*.

Among other things, Kenneth challenges the ALJ's finding that he is literate. At the hearing on April 26, 2017, Kenneth indicated that he does not do any reading, has trouble reading, does not have an email account, is not on Facebook, does not text, and goes to the grocery store with someone else "so they can read out the things to" him. (R. 93-95, 97). Kenneth testified that he was in special education classes in school and was able to get through school because they "just push[ed] [him] along." *Id*. at 102. When asked if he could read and write his own name, Kenneth responded, "Yeah. That's about it." *Id*. at 103. The ALJ did not ask Kenneth at the hearing if he could read or write a simple message such as instructions or inventory lists. Nor did the ALJ ask Kenneth to demonstrate his reading and writing abilities at the hearing. *See Green v. Barnhart*, 29 Fed. Appx. 73, 75 (3d Cir. 2002) (ALJ could have "easily resolved doubts" about claimant's alleged illiteracy by "asking [claimant] to read a brief passage or write a short note."); *Glenn*, 814 F.2d at 390-91 (claimant attempted to demonstrate his illiteracy by reading a recipe); *Cole v. Apfel*, 2000 WL 290432, at *4 (N.D. Ill. March 17, 2000) ("Ascertaining [claimant's] literacy would have involved a simple task such as asking him to read aloud a short news article, or asking him to write a note."). Despite three written requests from Kenneth's counsel, neither the ALJ nor the Appeals Council ordered a literacy test. *See* (R. 304) (8/15/2016—"The purpose of this letter is to respectfully request that Ken be tested for literacy. We met with him and there is no question that

4

he is illiterate."); (R. 174) (12/9/2016—"We respectfully request that WRAT testing be ordered for claimant to determine claimant's literacy skills."); (R. 218) (11/21/2017—requesting that the Appeals Council order a remand with "instructions to order WRAT testing in order to address the veracity of claimant and others strong assertion that claimant is unable to read or write in English.").

A person is illiterate if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564(b)(1). The regulations recognize, however, that "the numerical grade level that you completed in school may not represent your actual educational abilities." 20 C.F.R. § 404.1564(b); *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 390 (7th Cir. 1987) ("you can be illiterate even if you have had a significant amount of formal schooling (it may not have taken)"). Therefore, "[a] numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist." *Skinner v. Secretary of Health and Human Services*, 902 F.2d 447, 450 (6th Cir. 1990); 20 C.F.R. § 404.1564(b) ("if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities"). Once Kenneth raised the issue of illiteracy, "[t]he ALJ had an obligation to develop a complete record." *Yourek v. Barnhart*, 334 F.Supp.2d 1090, 1093 (N.D. Ill. 2004). A literacy determination is a "highly fact-bound question," and "[t]he Commissioner bears the burden of establishing that [Kenneth] is literate." *Glenn*, 814 F.2d at 390; *Silveria v. Apfel*, 204 F.3d 1257, 1261 (9th Cir. 2000).

The ALJ found that Kenneth has at least a high school education and is able to communicate in English. (R. 76). The ALJ rejected Kenneth's allegation of illiteracy because "there are some inconsistencies as to the claimant being literate." *Id.* at 71, 74. The ALJ gave

5

several reasons for her determination that Kenneth is not illiterate: (1) in a Disability Report, Kenneth indicated that he can read and understand English, write more than his name in English, completed high school, and did not attend special education classes; (2) he is capable of living alone; (3) he can go shopping for himself and a friend/prior co-worker; (4) he reported that he checked the mail; (5) he drives; (6) he can handle money, such as counting change; and (7) he can prepare TV dinners. *Id*. at 71, 74, 255, 257, 267, 269-71, 320. The ALJ further noted that there is no evidence that Kenneth "needs help with taking his medications such as reading the labels to be sure to take the correct medication at the proper time and the correct dosage" or that he needs "assistance at appointments." *Id*. at 71. The ALJ gave no weight to the opinion of his treating physician, Dr. Moriah Bang, that Kenneth has an intellectual disability and "little weight" to the opinion of Kenneth's former co-worker Rosa Zuniga that Kenneth "doesn't know how to read or write." *Id*. at 74-75, 320, 495.

The ALJ failed to properly evaluate Kenneth's alleged illiteracy. None of the evidence cited by the ALJ demonstrates that Kenneth can read or write a simple message, a prerequisite to a finding of literacy under the regulations. First, the ALJ's reliance on Kenneth's completion of high school does not provide substantial evidence that Kenneth is literate. As explained, because there is "evidence to contradict" the formal education level Kenneth completed, it was not appropriate for the ALJ to base Kenneth's educational abilities on his grade level. 20 C.F.R. § 404.1564(b); *see also Heldenbrand v. Chater*, 1997 WL 775098, at *4 (7th Cir. Dec. 15, 1997) (noting Department of Education data released in 1994 indicated that "as many as *one quarter* of all high graduates are completely or functionally illiterate."); *Glenn*, 814 F.2d at 390 (recognizing that "the quality and (more important) standards of some American schools today" precludes reliance on only a numerical grade level to determine literacy). Second, whether Kenneth actually

read the questions or wrote the answers in the Disability Report dated February 26, 2015 is questionable. Kenneth's current counsel explains that one of Kenneth's prior attorneys completed the form in "apparent error." Doc. 16 at 4. The form expressly states that it was completed by Kenneth's former counsel and no questions were asked at the hearing about the accuracy of the document. (R. 256). Kenneth testified that he was, in fact, in special education classes. *Id*. at 102. Moreover, in a letter dated August 15, 2016, a different, prior attorney expressly requested literacy testing because he had met with Kenneth and "there is no question that he is illiterate." *Id*. at 304. Further, the Adult Function Report and Work History submitted by Kenneth on April 16, 2015 indicated that his friend Bonnie Dotson completed the forms on his behalf. *Id*. at 274, 286.

Kenneth's ability to live alone and perform daily activities, like shopping, counting change, preparing TV dinners, retrieving mail, driving, and taking his medications do not necessary mean that Kenneth is literate. Illiteracy does not prevent a person from living alone, and the ALJ did not ask Kenneth how he managed to live alone prior to his eviction from his apartment in September 2016.[2] The ALJ determined that Kenneth's testimony that he can go shopping but needs someone with him to read labels is inconsistent with his stated ability to shop for a friend/co-worker. (R. 71). Kenneth's testimony that he needs someone with him to read labels is not inconsistent with the ability to shop for a former co-worker. One can shop without making or using a grocery list or reading labels. *Silveira*, 204 F.3d at 1262 n.15 (noting that shopping, among other activities such as obtaining a driver's license, paying bills, and handling money, can be conducted orally). As Kenneth explains, he could "easily ask a stock person at a store for assistance or his friend could have described the [item] or packing of what they needed." Doc. 16 at 6. Kenneth's ability to count change also does not compel a finding of literacy. "[T]he capacity

---

[2] Since 2016, Kenneth has been staying at a friend's home. (R. 88, 94).

to do simple arithmetic, a 'prerequisite to literacy,' is just that, a prerequisite." *Cole*, 2000 WL 290432, at *4 (*quoting Glenn*, 814 F.3d at 390); *Watson v. Astrue*, 2012 WL 2357746, at *7 (N.D. Ala. June 19, 2012) (VE testified that "even individuals he had encountered who were . . . markedly illiterate were usually able to count money.").

The ALJ noted that Kenneth is "able to prepare TV dinners which require[s] some ability to read to know how long to cook the meal in the oven or microwave." (R. 71). Kenneth's ability to heat up TV dinners is not sufficient to support a finding that he can read. It is entirely possible for a person to warm up a TV dinner in the oven or microwave without being able to read the instructions. The ALJ's decision further noted that Kenneth "reported that he checked the mail, which would require some capability to read." *Id*. But Kenneth's statement was in response to a request to "[l]ist the places you go on a regular basis," and Kenneth indicated "check my mail, my neighbors [sic] house." *Id*. at 271. This does not equate to an admission by Kenneth that he can read his own mail. One can retrieve mail without being able to read it. The ALJ did not ask Kenneth what "checking" the mail entailed or whether he requires the assistance of others to read his mail.

Regarding Kenneth's ability to drive, the ALJ found that driving indicates that "he has some ability to read in order to pass the driver test initially and to read signs." (R. 71). While the ability to obtain a driver's license "is not inconsistent with a finding of literacy, neither is it sufficient for such a finding once [the claimant] ha[s] raised the possibility of illiteracy." *Yourek*, 334 F.Supp.2d at 1093. That is because one can drive and obtain a driver's license without being able to read or write. *Rose v. Astrue*, 2010 WL 1253381, at *5 (E.D. Ky. March 24, 2010) (ALJ's finding that "reading the road signs is an important part of the test for a driver's license" incorrectly implied "that an individual could not pass an oral driver's license test without being able to read.");

8

*Lagerman v. Commissioner of Soc. Sec.*, 2002 WL 1608257, at *2 (finding claimant illiterate and noting that "[h]is driver's training examination was done orally."); *see also* 2020 Illinois Rules of the Road, at 15 ("Oral examinations (for the written test) can be requested in person at any Secretary of State driver's license facility . . . The services are provided for applicants who may have a language barrier or any type of reading or learning disability."). The ALJ did not ask Kenneth how he passed the driver's test or if he can read road signs. Nor did the ALJ did not ask Kenneth how he is able to correctly take his medications and whether he needs assistance. In addition, there is also no evidence that Kenneth was required to read or write at his medical appointments. In fact, medical records from three appointments contained in Exhibit 12F, cited by the ALJ as evidence that Kenneth did not need assistance at appointments, list "illiteracy" as one of Kenneth's active problems. (R. 71, 502, 505, 508, 511, 515).

The ALJ's remaining reasons for rejecting Kenneth's claim of illiteracy are also problematic. For instance, the ALJ gave no weight to the opinion of Dr. Bang, who found that Kenneth has "baseline intellectual disability" as "it does not refer to medical record/treatment notes for support." (R. 74, 495). However, a person's education, including illiteracy, is a vocational factor, not a medical impairment. 20 C.F.R. § 404.1564. As Kenneth points out, one need not suffer a traumatic brain injury or an intellectual disability to be illiterate. In other words, one can be illiterate without having an impairment that would cause illiteracy. Lack of a medically determinable impairment is thus an insufficient reason to dismiss Kenneth's claim of illiteracy.

The ALJ also supported her rejection of Kenneth's allegation of illiteracy by considering a report given by Kenneth's former co-worker Rose Zuniga. (R. 75, 320). The regulations require an ALJ to "consider all of the available evidence from [a claimant's] medical and nonmedical sources." 20 C.F.R. § 404.1529(c)(1); 20 C.F.R. § 404.1513(a)(4) ("Evidence from nonmedical

sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim. We may receive evidence from nonmedical sources . . . ."); 20 C.F.R. 404.1545(a)(3) (in assessing RFC, "[w]e will also consider descriptions and observations of your limitations from your impairments(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). An ALJ "generally should explain the weight given to opinions from [non-medical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2).

Ms. Zinga indicated that she has known Kenneth since 1995 when she started working for their former employer. (R. at 320). She stated that Kenneth "doesn't know how to read or write." *Id*. Ms. Zinga explained that on the job, Kenneth "was limited to repetitive manual labor or whatever he was asked to do that didn't require reading or writing, including heavy lifting." *Id*. The ALJ gave Ms. Zuniga's statement only "little weight" because (1) she was not a treating source, (2) she was not familiar with the Social Security Administration's standard for disability, and (3) she did not reference the medical record in support of her opinion. *Id*. at 75.

None of these reasons are adequate to support discounting Ms. Zinga's statement. Because the regulations permit statements from non-medical sources, an ALJ cannot discount a former co-worker's statement merely because she is not a treating source. *Roque v. Colvin*, 2016 WL 1161292, at *5 (N.D. Ill. March 22, 2016) ("By definition, lay witnesses do not have medical training, but the regulations require ALJs to consider their statements."). When weighing medical opinions and opinions from non-medical sources who have seen an individual in their professional capacity, ALJs may consider "the amount of understanding of our disability programs and their

evidentiary requirements . . . regardless of the source of that understanding, and the extent . . . [of] familiar[ity] with the other information in the case record." SSR 06-03p, 2006 WL 2329939, at *3, 5 (Aug. 9, 2006).[3] On the other hand, lack of familiarity with the Social Security Administration's standard for disability or the case record is not a factor for evaluating evidence from non-medical sources who have not seen the claimant in their professional capacity and thus, is not a valid reason to accord little weight to a co-worker's statement. *Id*., at *6 ("In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."). Few, if any, non-medical sources who have not seen the claimant in their professional capacity have familiarity with the Social Security Administration's standard for disability. Thus, the submission of non-medical statements would be essentially pointless if these lay witnesses had to be familiar with Social Security disability standards. The ALJ's third stated reason—"there is no reference to the medical record for support of this opinion"—is similarly flawed. Although an ALJ may consider the degree to which the non-medical source's statement is consistent with and supported by other evidence in the record, non-medical sources who have not seen the claimant in their professional capacity do not have to cite to the medical record in support of their opinions or the statements of these lay witnesses would almost never be given credit.

In reaching her conclusion that Kenneth is not illiterate, the ALJ also ignored evidence unfavorable to her finding. The ALJ failed to mention or weigh the third-party statement by John Smyth, a former supervisor. "[A]lthough an ALJ does not need to discuss every piece of evidence

---

[3] Social Security Ruling 06-03p has been rescinded but applies to claims such as Kenneth's that were filed before March 27, 2017. (R. 221-22); SSR 96-2p, 2017 WL 3928298 (March 27, 2017).

11

in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *Zurawski v. Halter*, 245 F.3d 881, 888 ("'[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings.'") (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999)). During the entire time that Kenneth worked at the syrup factory between 1982 and 2013, Mr. Smyth worked for the same company as the Vice President of Operations. (R. 318). Mr. Smyth provided critical evidence regarding Kenneth's alleged illiteracy:

> Ken cannot read or write. I had a previous career as a fourth grade school teacher, and I devoted some time to tutoring Ken. After making zero progress over a few months, I was able to contact the principal of one of his schools through Barry's [the business owner] social contacts. They had determined through testing that he would never be able to read or write. However he is keenly observant, smart in some other ways, and employs a lot of other "work-arounds" that other illiterate people do. If your agency has any doubt about Ken's illiteracy, test him again promptly and we will help him get to the test. Appointments are often managed with help since Ken has difficulty recording dates and navigating to unfamiliar locations.

*Id*. The ALJ did not mention Mr. Smyth's statement, let alone explain how she weighed the evidence. Because there is a serious question here as to whether Kenneth is illiterate, the ALJ will have an opportunity to confront this significant contradictory evidence on remand. *Brinley v. Berryhill*, 732 Fed. Appx. 461, 466 (7th Cir. 2018) (recognizing that "Ruling 06-03p does not *require* the agency to take nonmedical evidence into account, it simply permits it" but noting that a remand for other reasons "leaves open the possibility of [the ALJ] taking another look at" the claimant's husband's third-party report); *Moore*, 743 F.3d at 1122 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.").

The Court also notes that the ALJ stated that: (1) Kenneth alleged illiteracy for the first time when he submitted former co-worker Rose Zuniga's letter dated December 7, 2016 to the agency and again in his hearing testimony on April 26, 2017 and (2) "no evidence discussed the

12

claimant being illiterate." (R. 71). Both statements are inaccurate. Kenneth submitted an Adult Function Report dated April 14, 2015 completed by his friend Bonnie Dotson which states "cannot read or write anything but name." *Id.* at 267, 270, 272, 274. On August 15, 2016, Kenneth's counsel advised the ALJ that "there is no question that he is illiterate" and requested literacy testing. *Id.* at 304. Moreover, Dr. Bang's August 3, 2016 note lists "illiteracy" as an active problem. *Id.* at 442. And, on November 10, 2016, Mr. Smyth submitted a letter confirming Kenneth's illiteracy. *Id.* at 318-19. All of this evidence predates the letter from Ms. Zuniga and discusses Kenneth being illiterate.

In sum, the Court finds that the ALJ's determination that Kenneth is literate is not supported by substantial evidence. The ALJ's failure to adequately address Kenneth's allegation of illiteracy was not harmless error. As Kenneth asserts, if he is limited to light work and is illiterate, he is disabled under the medical-vocational guidelines at age 50. Rule 202.09 directs a finding of "disabled" when an individual closely approaching advanced age (age 50-54), who is "[i]lliterate or unable to communicate in English" and has unskilled or no past work, is limited to light work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2, Rule 202.09. Accordingly, this case must be remanded for the ALJ to reassess Kenneth's allegation of illiteracy.

On remand, the ALJ is directed to more fully and fairly develop the record regarding Kenneth's literacy. The Court notes that "[t]ests such as the Wechsler Individual Achievement Test (WIAT), the Wide Range Achievement Test 3 (WRAT3), or the Woodcock-Johnson Psychoeducational Battery—Revised: Tests of Achievement (WJ-R ACH), are designed to measure people's ability to, among other things, read and write." *Wilcutts v. Apfel*, 143 F.3d 1134, 1138 (8th Cir. 1998). The ALJ shall also evaluate the lay witness statements of John Smyth and

13

Rose Zuniga in accordance with SSR 06-03p and explain how she weighed each lay opinion and why she gave each the weight she did.

## CONCLUSION

For the reasons set forth above, Kenneth's request for remand is granted in part and the Commissioner's Motion for Summary Judgment [28] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed in part, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**SO ORDERED.**

Dated: January 27, 2020

_____
Sunil R. Harjani
United States Magistrate Judge